FILED by _CP_ D.C.

AUG 1 7 2017

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES ex rel. JOHN SIMONS
and LEWIS COOK,

        Plaintiffs,

vs.

HEALTH AND PALLIATIVE SERVICES
OF THE TREASURE COAST, INC., a Florida
not-for-profit Corporation; THE HOSPICE
OF MARTIN AND ST. LUCIE, INC., a Florida
not-for-profit Corporation; and HOSPICE
OF THE TREASURE COAST, INC., a Florida
not-for-profit Corporation,

        Defendants.

_____/

Case No.: 11-14328-CIV-MARTINEZ/LYNCH

**FILED UNDER  SEAL PURSUANT
TO 31 U.S.C. § 3730**

**AMENDED COMPLAINT FOR
VIOLATION OF FEDERAL FALSE
CLAIMS ACT**

        THE UNITED STATES OF AMERICA ex rel., JOHN SIMONS ("*Dr. SIMONS*") and LEWIS COOK ("*Dr. COOK*")(referred to collectively as "*Relator-Plaintiffs*"), states as follows for their amended complaint against Defendants, HEALTH AND PALLIATIVE SERVICES  OF THE TREASURE COAST, INC., a Florida not-for-profit corporation;  THE HOSPICE  OF MARTIN AND ST. LUCIE, INC' a Florida not-for-profit corporation; and  HOSPICE OF THE TREASURE COAST, INC., a Florida not-for-profit corporation (hereinafter referred to collectively as "*Defendants*" or "*TCH*"):

## I.    INTRODUCTION

        1.    This is an action on behalf of the UNITED STATES OF AMERICA brought by Relator-Plaintiffs, JOHN SIMONS and LEWIS COOK, seeking to recover civil damages and penalties from Defendants for knowingly making, and causing to be made, false

Case 2:11-cv-14328-JEM   Document 75   Entered on FLSD Docket 08/17/2017   Page 2 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page 2 of 52

and/or fraudulent Hospice reimbursement claims and records and/or statements to arrange for false claims to be paid by the Medicare program in violation of the Federal Civil False Claims Act, 31 U.S.C. §3729 *et seq.,* as amended (the "FCA") from on or about at least June 12, 2006 (Counts I-III).

2.     Defendants are providers of multiple Hospice services (including but not limited to providing home Hospice care and Hospice services in assisted living facilities, skilled nursing homes, operating and maintaining multiple Hospice care facilities as well as providing hospice care in miscellaneous other facilities) throughout the area known as the "*Treasure Coast*" of Florida. In 2010, Defendants had gross Hospice related revenues of $46,768,094 of which at least 70% of the benefits came from Medicare, 18% from Medicaid and 2% from Private Insurance. Defendants provide Hospice care to patients at their two facilities, one located at the Martin Hospice House on 1000 Ruhnke Street Stuart, FL 34994 and the other located at The Fort Pierce Hospice House on 5090 NW Dunn Road Fort Pierce, FL 34981 and at unaffiliated Skilled Nursing Facilities and Assisted Living Facilities throughout the treasure coast along with providing home Hospice care services to residents of the Treasure Coast, Indiantown and Okeechobee counties.

3.     The patients recruited and admitted to Defendants' Hospice programs in a Skilled Nursing Facility or an Assisted Living Facility typically receive daily care from the facility or home within which they reside. Defendants certify the patients for Hospice care to provide *allegedly additional* services under the premise that they are terminally ill and have less than six months to live.

4.     Defendants receive a per diem reimbursement from Medicare from the date Defendants enroll the patient in the Hospice program.  Medicare pays the per diem rate

\\fs2\files\simons v hospice of treasure coast 11_002\comp\amended complaint 170816chris.docx

Case 2:11-cv-14328-JEM   Document 75   Entered on FLSD Docket 08/17/2017   Page 3 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **3** of **52**

regardless of the amount of services rendered during a given day, if any. In 2010, Medicare's basic daily (unadjusted) reimbursement rate ranged from $146.63 to $855.79, depending on the level of care provided. Defendants receive other Medicare reimbursements for items such as medical supplies and pharmaceuticals for so long as Defendants recertify the patient's continuing terminal disease prognosis.

5.    By wrongfully and/or illegally recruiting and initially certifying Medicare recipients as Hospice patients, and then continuing to falsely recertify these Medicare recipients as eligible for Hospice benefits, Defendants were able to increase their profits, illegally and dramatically.

6.    Defendants' fraudulent certification scheme included, *inter alia,* certifying new patients as Hospice-eligible where there was no clinical data in patients' medical records to legitimately substantiate their terminal diagnosis/prognosis and falsifying Attending Physicians' signatures on Medicare initial Hospice certification paperwork among other acts.

7.    Once admitted, many patients were repeatedly and fraudulently recertified for Hospice care despite the absence of clinical data supportive of a terminal prognosis, by, *inter alia,* ignoring caregiver notes of patient visits that established the patient's medical condition as chronic, not terminal; training caregivers to fabricate medical records to make it appear that the patients who   were being re-certified remained eligible for Hospice when those patients were not terminal; and creating diagnoses that would qualify a patient for Hospice recertification when there was no medical justification for the new diagnoses.

8.    Defendants' profit-driven approach had a negative impact on the quality of care provided to its patients. Defendants routinely cut corners on resources essential to proper care.

\\fs2\files\simons v hospice of treasure coast 11_002\comp\amended complaint 170816chris.docx

Case 2:11-cv-14328-JEM  Document 75  Entered on FLSD Docket 08/17/2017  Page 4 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page 4 of **52**

9.    The fraudulent admission and re-certification of ineligible patients for Hospice care at all of Defendants' offices during the relevant period resulted in an approximate total loss to THE UNITED STATES of or around 44% of Defendants' total Medicare Hospice revenues for the relevant period of time.

## II.    **THE PARTIES**

10.    THE UNITED STATES OF AMERICA ex rel. Relator-Plaintiffs, JOHN SIMONS and LEWIS COOK, is the Plaintiff for whom recovery is sought for the false and fraudulent reimbursement of claims for Hospice services submitted to federally funded United States Health Care programs. Defendants' primary target from which to bilk fraudulent revenues has been, and continues to be, Medicare.  From June 12, 2006 through January 14, 2011, Relator-Plaintiff, JOHN SIMONS and from June 25, 2009 through February 4, 2011, Relator-Plaintiff LEWIS COOK were each employed by Defendants as a Staff Physician pursuant to the terms of a Staff Physician Employment Agreement. As Staff Physicians, Relator-Plaintiffs worked at the facilities owned and controlled by Defendants in Martin, St. Lucie and Okeechobee Counties. In this position, each of the Relator-Plaintiffs attended to patients admitted into the facilities operated by Defendants and made visits to the residences of patients to whom Defendants provided home Hospice services, among other things.  They also routinely attended, *inter alia,* Interdisciplinary Team ("IDT") Meetings and statutorily mandated Staff Meetings convened on a regular basis to discuss and assess patients' continuing eligibility for Medicare Hospice benefits. 42 CFR §418.68.

11.    Defendant, HEALTH AND PALLIATIVE SERVICES OF THE TREASURE COAST, INC., is a Florida not-for-profit corporation and a healthcare company engaged in the business of providing Hospice services and supplies which are paid for by the

\\fs2\files\simons v hospice of treasure coast 11_002\comp\amended complaint 170816chris.docx

Case 2:11-cv-14328-JEM  Document 75  Entered on FLSD Docket 08/17/2017  Page 5 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **5 of 52**

federal United States, through, *inter alia,* the Medicare program. Defendant, HEALTH AND PALLIATIVE SERVICES OF THE TREASURE COAST is the parent corporation of the wholly owned and controlled subsidiaries/co-Defendants, THE HOSPICE OF MARTIN AND ST. LUCIE, INC. and HOSPICE OF THE TREASURE COAST, INC. Presently, Defendant, HEALTH AND PALLIATIVE SERVICES OF THE TREASURE COAST, INC, provides Hospice services in at least 3 locations on the Treasure Coast, including Martin, St. Lucie and Okeechobee Counties.    Defendant HEALTH AND PALLIATIVE SERVICES OF THE TREASURE COAST's corporate headquarters are located at 1201 South East Indian Street, Stuart, FL 34997.

12.    Defendant, THE HOSPICE OF MARTIN AND ST. LUCIE, INC, is a Florida not-for-profit corporation and a healthcare company engaged in the business of providing Hospice services and supplies which are paid for by the federal United States, through, *inter alia,* the Medicare program. Defendant, THE HOSPICE OF MARTIN AND ST. LUCIE, INC., is a wholly owned and controlled subsidiary of Defendant, HEALTH AND PALLIATIVE SERVICES OF THE TREASURE COAST, INC. Presently, Defendant, THE HOSPICE OF MARTIN AND ST. LUCIE, INC., provides Hospice services in at least 3 locations on the Treasure Coast, including Martin, St. Lucie and Okeechobee Counties. Defendant THE HOSPICE OF MARTIN AND ST. LUCIE, INC.'s corporate headquarters are located at 1201 South East Indian Street, Stuart, FL 34997.

13.    Defendant, HOSPICE OF THE TREASURE COAST, INC. is a Florida not-for-profit corporation and a healthcare company engaged in the business of providing Hospice services and supplies which are paid for by the federal United States, through, *inter alia,* the Medicare program. Defendant, THE HOSPICE OF THE TREASURE COAST, INC., is a

Case 2:11-cv-14328-JEM   Document 75   Entered on FLSD Docket 08/17/2017   Page 6 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **6** of **52**

wholly owned and controlled subsidiary of Defendant, HEALTH AND PALLIATIVE SERVICES OF THE TREASURE COAST, INC. Presently, Defendant, HOSPICE OF THE TREASURE COAST, INC., provides Hospice services in at least 3 locations on the Treasure Coast, including Martin, St. Lucie and Okeechobee Counties.  Defendant, HOSPICE OF THE TREASURE COAST's corporate headquarters is located at 1201 South East Indian Street, Stuart, FL 34997.

### III.     JURISDICTION AND VENUE

14.     This is a civil action arising under the laws of the United States to redress violations of 31 U.S.C. §§3729-3730. This Court has jurisdiction over the subject matter of this action: (i) pursuant to 31 U.S.C. §3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730; (ii) pursuant to 28 U.S.C. §1331, which confers federal subject matter jurisdiction; and (iii) pursuant to 28 U.S.C. §1345 because the United States is a Plaintiff.

15.     This Court has jurisdiction over the Defendants under 31 U.S.C.§3732(a) because it can be found in, is authorized to transact business in and is now transacting business in this District. In addition, acts giving rise to all causes of action including those proscribed by 31 U.S.C. §3729 &. §3730(h) have occurred in this District.

16.     Venue is proper in this district because Defendants conducted and continue to conduct business in Martin, St. Lucie and Okeechobee Counties, which are all located within the jurisdiction of this district and because the acts giving rise to this action occurred within Martin, St. Lucie and Okeechobee Counties, Florida.

### IV.     DEFENDANT'S RELIANCE ON THE MEDICARE PROGRAM

Case 2:11-cv-14328-JEM   Document 75   Entered on FLSD Docket 08/17/2017   Page 7 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **7** of **52**

17.     In 2010, Defendants operated 3 offices in Florida and served as the sole Hospice provider for the Treasure Coast area in the United States.

18.     Defendants provide care in a variety of settings, including skilled nursing facilities, assisted living facilities, patients' private homes, hospitals, and via inpatient Hospice facilities.

19.     Defendants' patient population is almost exclusively comprised of Medicare beneficiaries, with a total of approximately 550 Hospice patients as of December 31, 2010.

20.     As a result, Medicare is Defendants' primary source of revenues. From January 1, 2010 to December 31, 2010 Defendants' annual gross revenues were $46,768.094, virtually all of which was derived from Medicare's payment of Defendants' Medicare Hospice claims.

21.     As a Medicare Hospice provider, Defendants agreed to comply with all Federal and State regulations governing Hospice providers.  However, Defendants routinely violated Medicare's highly regulated patient certification and recertification procedures by billing Medicare for services rendered to beneficiaries who Defendants knew were not eligible for the Medicare Hospice benefit because they were not terminally ill.

22.     In furtherance of the fraud scheme described herein, Defendants instituted company-wide policies, protocols, and business practices with the purpose of fraudulently obtaining tens of millions of dollars from the Medicare program and, further, Defendants presented, and caused to be presented, the false claims to the Medicare program for Hospice benefits by using the false records, backdating certifying dates and/or statements (including false certifications) to obtain payment of its false Medicare claims.

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **8** of **52**

## A.    The Medicare Hospice Benefit

23.    The United States pays for Hospice care under Medicare Part A for program beneficiaries who meet specific eligibility requirements.

24.    For qualified beneficiaries, the Medicare Hospice benefit includes the cost of most prescription drugs for pain control and symptom management, durable medical equipment, and care provided through a Hospice provider's IDT.  The IDT assesses the needs of each patient and their family and has responsibility for the development and implementation of an appropriate health care plan.

### 1.    Eligibility

25.    42 CFR §418.20 sets forth the Medicare Hospice benefit "*eligibility requirements*" and mandates that, for a beneficiary to be eligible to elect Hospice care under Medicare, an individual must be:

> A.    Entitled to Part "A" of Medicare; and,
>
> B.    Certified as being terminally ill, in accordance with the "*Certification of Terminal Illness*" (CTI) statutory requirements set forth in 42 CFR § 418.22.

26.    Pursuant to 42 CFR § 418.22(a), titled "*Timing of Certification,*" a Hospice provides must obtain written certification of terminal illness for *each* of the following periods:

> A.    An initial 90-day period;
>
> B.    A subsequent 90-day period; and
>
> C.    An unlimited number of subsequent 60-day periods.

\\fs2\files\simons v hospice of treasure coast 11_002\comp\amended complaint 170816chris.docx

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **9** of **52**

27.     Medicare Hospice regulations also govern the physicians who must certify, by written signature, the Certification of beneficiaries' terminal illness. These provisions, entitled *"Sources of Certification,"* provide that, for the initial 90-day period, known as the *initial* certification, the Hospice must obtain a written Certification Statement from:

A.     The Medical Director of the Hospice or the physician member of the Hospice interdisciplinary group; and

B.     The individual's Attending Physician if the individual has an Attending Physician.42 CFR §418.22 (c).

28.     For subsequent periods, known as recertification, only the Medical Director of the Hospice or the physician member of the Hospice interdisciplinary group can sign the Certification Statement. 42 CFR §418.22(d).

29.     All physician Certifications must conform to the following requirements:

A.     It must specify that the individual's prognosis is for a **life expectancy of 6 months or less** if the terminal illness runs its normal course; and

B.     clinical information and other documentation that support the medical prognosis must accompany the certification and must be filed in the medical record with the written certification. Initially, the clinical information may be provided verbally, and must be documented in the medical record and included as part of the Hospice's eligibility assessment. 42 CFR §418.3.

30.     Medicare regulations require physician certifications to be based on the physician's clinical judgment regarding the normal course of the individual's illness. 42 CFR §418.22. The meaning of this requirement is clarified in the Commentary to the Medicare regulations and the subsequent statutory amendments thereto. The Commentary adds that while

Case 2:11-cv-14328-JEM   Document 75   Entered on FLSD Docket 08/17/2017   Page 10 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page 10 of 52

medical prognostications of life expectancy are not always exact, that does not negate the fact that there must be a basis for a certification. See Commentary from 70 Federal Register, 70533-70535, November 22, 2005. Accordingly, *"[a] Hospice needs to be certain that the physician's clinical judgment can be supported by clinical information and other documentation that provide a **basis for the certification of 6 months or less** if the illness runs its normal course." Id. A signed certification, absent a medically sound basis that supports the clinical judgment, is not sufficient for application of the Hospice benefit under Medicare."* Id. (emphasis added).

31.     A Hospice provider must ***always*** obtain a written physician Certification before it submits a claim for payment. Generally, the written Certification must be obtained within two (2) calendar days after a certification period begins and must be filed in each patient's medical record.

32.     Federal law also governs Hospice providers' creation of and safeguarding of patient records of the Hospice care provided. As a *Condition of Participation,* a Hospice provider must establish and maintain a clinical record for every individual receiving care and services. Such records must be complete, promptly and accurately documented, readily accessible, and systematically organized to facilitate retrieval. Each clinical record must be a comprehensive compilation of information. Entries must be made for all services provided and signed by the person providing the services. Each patient's record must contain the following:

     A.     The initial and subsequent assessments;

     B.     The plan of care;

     C.     Identification data;

     D.     Consent and authorization and election forms;

\\fs2\files\simons v hospice of treasure coast 11_002\comp\amended complaint 170816chris.docx

Case 2:11-cv-14328-JEM Document 75 Entered on FLSD Docket 08/17/2017 Page 11 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page 11 of 52

E.     Pertinent medical history; and

F.     Complete documentation of all services and events

(including evaluations, treatments, progress notes, etc.).

33.     The beneficiary must also *elect* the Hospice benefit. To do so, the beneficiary (or his her representative,) must, *inter alia,* acknowledge that he or she has been given a full understanding of the palliative rather than curative nature of Hospice care, as it relates to the individual's terminal illness.

34.     Pursuant to § 3131(b) of the Affordable Care Act *"ACA"* a Hospice physician or nurse practitioner is now required to have a face-to-face encounter with a Hospice patient prior to the patient's 180TH day recertification, and each subsequent recertification. The encounter must occur no more than 30 calendar days prior to the start of the Hospice patient's third benefit period. The provision applies to recertification on and after January 1, 2011.

35.     Medicare relies upon qualified physician Certifications in paying claims for Hospice services.

## 2.   **Medicare Reimbursement**

36.     A Medicare Hospice provider is generally reimbursed by the United States at one of four fixed *per diem* rates, dependent on the level of care, as described below (along with their representative 2011 reimbursement rates) (The daily hospice payment rates are adjusted to account for differences in wage rates among markets. Each category of care's base rate has a labor share and a non-labor share. The labor share of the base payment amount is adjusted by the hospice wage index. Base rates are updated annually based on the hospital market basket index.):

Case 2:11-cv-14328-JEM   Document 75   Entered on FLSD Docket 08/17/2017   Page 12 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **12** of **52**

A.   <u>Routine Home Care</u> (RHC)(Code 651)($146.63/day) – care provided to a patient's residence or at a nursing home;

B.   <u>Continuous Home Care</u> (Code 652) ($855.79/day or $35.66/hour) – care at home during a "*period of crises*" which primarily consists of continuous nursing care. An hourly rate ($35.66) may be used if nursing care is provided at less than a 24 hour basis;

C.   <u>General Inpatient Care</u> (GIC)(Code 656)($652.27/day) – covers inpatient care when necessary for pain control or acute/chronic system management which cannot be provided in other settings; and

D.   <u>Inpatient Respite Care</u> (IRC)(Code 655)($151.67/day) – covers care provided by a certified Hospice program at an unapproved inpatient facility.

37.   To better manage Medicare claims payments, the Medicare regulations provide for an annual "*Cap*" on the amount of reimbursement each facility a Hospice provider operates is eligible to receive during each Medicare fiscal year (the *"Cap Period"*). 42 CFR §§ 418.301 and 418.309. A facility's Medicare Cap number depends upon the number of Medicare beneficiaries the provider enrolls during the applicable Cap year. The Medicare Cap is calculated at the end of the Cap Period. Accordingly, if a provider exceeds the Cap during the Cap period, the provider must refund the overage to Medicare.

### 3.   <u>Hospice Provider Enrollment & Claims Reimbursement</u>

38.   A Hospice provider must enroll in the Medicare program, using the Medicare Enrollment Application, Form CMS-855A, to receive Medicare reimbursement for covered Hospice services provided to eligible beneficiaries. The enrollment application includes

Case 2:11-cv-14328-JEM   Document 75   Entered on FLSD Docket 08/17/2017   Page 13 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **13** of **52**

a certification statement requiring the enrolling provider to certify the provider's adherence to a list of requirements, including:

> A.    *I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.*

> B.    *I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.*

39.    Following enrollment, to receive reimbursement, a Hospice provider must submit to the Medicare fiscal intermediary a written claim, the Form B-92 (now the CMS 1500), or an electronic claim submitted by signing and complying with an "*Electronic Data Interchange Enrollment Agreement*."

40.    Pursuant to the Electronic Data Interchange Enrollment Agreement, the Hospice provider certifies that all claims are true, accurate, and correct; agrees that all claims are a claim for payment under the Medicare program that will be paid from federal funds; and agrees that the falsification or misrepresentation of any record or information relating to such claims violates applicable federal law. The electronic claims themselves contain a certification of accuracy and veracity. Defendants executed an Electronic Data Exchange Agreement.

Case 2:11-cv-14328-JEM   Document 75   Entered on FLSD Docket 08/17/2017   Page 14 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **14** of **52**

41.    A Hospice provider that knowingly, or with reckless disregard, submits claims to Medicare (or knowingly causes such claims to be submitted to Medicare) for patients it knows are not terminally ill, as defined by applicable law, is liable for the submission of a false claim, as that term is defined under the False Claims Act.

42.    . The Medicare Hospice Benefit is also subject to regulatory requirements set forth in the Code of Federal Regulations. Pursuant thereto, Hospice providers must comply with specified regulatory requirements, including those regulations grouped under the title *"Conditions of Participation."* 42 CFR § 418.50(a). Using the electronic and other means, Defendants routinely filed false certifications of compliance with all applicable regulatory requirements because Defendants failed to comply with many substantive Hospice benefit eligibility requirements.

## V.    ILLEGAL CERTIFICATIONS AND RE-CERTIFICATIONS

### A.    False Initial Certifications of Medicare Beneficiaries

43.    From 2006 or earlier through 2010 or later, Defendants have systematically and fraudulently certified Medicare beneficiaries as terminally ill, thereby falsifying their eligibility for the Medicare Hospice benefit.  As a result, Defendants have routinely submitted false claims, and false records to get false claims paid, to the Medicare program.

44.    In furtherance thereof, Defendants' corporate personnel at the highest level caused policies and procedures to be implemented that were intended to increase initial certifications of Medicare beneficiaries who were not terminally ill and who therefore were not eligible for Medicare-funded Hospice care.  A sample of the policies initiated during the relevant period of time for said purpose is as follows:

\\fs2\files\simons v hospice of treasure coast 11_002\comp\amended complaint 170816chris.docx

Case 2:11-cv-14328-JEM   Document 75   Entered on FLSD Docket 08/17/2017   Page 15 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **15** of **52**

A.     In a policy implemented by TCH CEO Dr. Lou Benson and Director of Admissions, Diane Wright, staff and physicians were instructed and ordered not to wait for the patient to be properly certified as "*Hospice Eligible*" before beginning Hospice services.

B.     In a policy implemented by TCH CMO/Medical Director, Dr. Bernice Burkarth, TCH physicians and staff and billing personnel were instructed and ordered not to wait for the Attending physician of record and/or a Medical Director to sign the CTI/APCS forms before they enrolled the patient for Hospice Benefits and care.

C.     In a policy implemented and controlled by the Informatics Department CIO Ted Charron, TCH began to back date the CTI/APCS so as to make it appear that the Attending Physician and/or the Medical Director had certified the patient prior to the missed certifying deadline date. This was done by having staff access the computer systems and enter a date into the record prior to the certifying deadline date, and then print the CTI/APCS with a backdated date adjacent to the physician signature line so it appeared as if had been signed on an earlier date so that TCH could then illegally bill Medicare for services rendered prior to being properly certified.

D.     In a policy implemented by the CMO/Medical Director, Dr. Bernice Burkarth, TCH ordered and required all TCH physicians to sign the APCS/CTI with full knowledge that a TCH physician had never examined the patient or reviewed the patient's medical records.

E.     In a policy implemented by CEO, Dr. Lou Benson and the V.P. of Compliance in charge of medical records, Martha Lassiter, TCH unilaterally and without authorization began to reassign the Attending Physician to a TCH physician without

Case 2:11-cv-14328-JEM  Document 75  Entered on FLSD Docket 08/17/2017  Page 16 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **16** of **52**

informing the patient or the Beneficiary's Attending Physician when and if the APCS statement was not signed by Beneficiary's Attending and returned before the certifying deadline so as to permit submission of claims before the certifying deadline.

F.  In a policy implemented by the CMO/Medical Director, Dr. Bernice Burkarth, and in furtherance of the policy set forth above in sub-paragraph (E), TCH began to reassign patients to a TCH physician and demand that the new TCH Attending sign the CTI/APCS even though the patient had never been examined or the medical record reviewed.

G.  In a policy implemented by CMO/Medical Director, Dr. Bernice Burkarth, TCH demanded and required that that the TCH physicians sign the CTI as the Medical Director, knowing full well that the TCH physician was not the actual or even acting Medical Director, in direct violation of the certification requirements.

H  Dr. Lou Benson – CEO created a protocol that required all road patients who may require Crisis Care (CC) to be transferred into the Hospice House (HH) and required the nursing staff to falsely state that such patients needed GIC level of care even if such patients did not meet Medicare qualifications for that level of care. As a result, Medicare was and is currently being charged an approximate additional $650/day for every day that such patients remain in the Hospice House.  Relator-Plaintiffs questioned the policy and informed Dr. Benson that it was up to the TCH physicians to determine if the patient qualified for GIC level of care and not the nurse, but Dr. Benson responded that Relator-Plaintiffs and other physicians needed to fill up the Hospice House and that Relator-Plaintiffs and other physicians were "*in the way*."  Relator-Plaintiffs reminded  Dr. Benson that it required a TCH physician order to transfer the

Case 2:11-cv-14328-JEM   Document 75   Entered on FLSD Docket 08/17/2017   Page 17 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page 17 of 52

patient into the Hospice House and that the TCH physician could not give the order unless they were examined by the TCH physician, or at the very least talked to the RN case manager and discussed why/how the patient was qualified for GIC care in the Hospice House, but Dr. Benson stated in front of all the physicians in a physician's meeting that he did not want the TCH physician to see the patient - and instructed Relator-Plaintiffs and the other physicians to "*just sign the order*" and "*shut-up*". No further discussion on this issue would be tolerated.   Relator-Plaintiffs again stated that Dr. Benson's plan to fill the Hospice House would not work because Relator-Plaintiffs, as the receiving doctors responsible for the patients in the Hospice House, could not under the law or in good conscience accept the patient if they did not meet criteria for GIC care. Dr. Benson promptly responded by stating that Relator-Plaintiffs were to see the patient and write in the admission note that they were GIC qualified even though they were not, and then wait three (3) days before kicking them off GIC and changing them to "*Routine Level of Care*." In justifying this order, Dr. Benson reasoned "*maybe by then they may get worse or you could find something to keep them on as GIC*".   Relator-Plaintiffs were further instructed that if they discharged the patient off GIC and switched them to "*Routine*", they were to have the Social worker talk to the family and tell them the TCH physician had discharged them and they were going to be charged $250/day for room and board for every day they remained in the HH.  Relator-Plaintiffs again objected and refused to violate any law and mentioned to Dr. Benson how traumatic this was going to be for the patient and families, to which he replied "*too bad, you're the one discharging them, not me*."

Case 2:11-cv-14328-JEM Document 75 Entered on FLSD Docket 08/17/2017 Page 18 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **18** of **52**

I.      In a policy implemented by CEO, Dr. Lou Benson, TCH began to routinely direct admit patients into the Hospice House who did not and do not qualify for GIC level of care with issues of pain and agitation. Generally, when a patient arrives at the Hospice House, they usually have been pre-medicated with morphine or another pain reliever, and many times exhibit no signs of pain. Relator-Plaintiffs regularly would arrive at the Hospice House and examine the patient, where they could easily establish that it was apparent that these patients did not require any additional medication for pain and were "*dumped*" into the Hospice House to fill the rooms. Many times the patient and the families would ask why the patient was sent to the Hospice House, and not home, as they had requested. The policy resulted in fraudulent billing for GIC level of care services.

J       In a policy implemented prior to June 2006 by then-CMO Dr. Dan Maison, TCH established a protocol that requires a patient to be sent to the Hospice House for at least one (1) week for Methadone conversion and/or dose adjustment, contrary to industry standard. The industry standard is that the conversion/adjustment is completed at home. When Relator-Plaintiff, Dr, SIMONS asked the Medical Director (Dr. Dan Maison and later Dr. Bernice Burkarth) why TCH required the patient to come into the Hospice House, each stated that they did so to monitor cardiac symptoms during conversion and/or dose adjustment. When Relator-Plaintiff, Dr. SIMONS noted that such a position was ridiculous in that TCH did not even have any cardiac monitoring devices, EACD or even an EKG machine in the facility, they told Dr. SIMONS "*not to cause trouble*" and to "*do as you are told*". As a result of this policy, many patients were

Case 2:11-cv-14328-JEM   Document 75   Entered on FLSD Docket 08/17/2017   Page 19 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **19** of **52**

brought into the Hospice House and Medicare was charged additional GIC days for these patients.

      K.      In a policy implemented on or about 1994 and continuing through the fall of 2010 and enforced by CEO, Dr. Lou Benson and COO, Jeanine Cacciatore, RN, TCH knowingly over-billed Medicare two (2) additional hours for every patient on crisis care since 1994. When the policy and violation was brought to the attention of TCH by Relator-Plaintiffs and others, instead of reporting the problem to Medicare, TCH attempted to cover it up and instructed Relator-Plaintiffs and others not to report the matter or discuss it further.

      45.      Defendants' executives, including those holding the office of CEO, COO Medical Director, CIO and others, overtly pressured Defendants' employees to "*find a way*" to enroll ineligible Medicare beneficiaries on service. Defendants' unlawful initial Certification policies and procedures included, but are not limited to:

      A.      Failing to obtain statutorily required clinical information, including beneficiaries' medical history, thereby causing physician staff to certify Medicare beneficiaries' as terminally ill without any medical basis;

      B.      Falsifying Medicare physician certifications by having staff physicians falsely sign Certifications as the beneficiaries' Attending Physicians;

      C.      Falsifying Medical records and Certifications by having staff and physicians falsely sign Certifications that patients needed or required GIC services; and

      D.      Intentionally and fraudulently billing for two additional house of crisis care for each patient receiving the same since 1994.

Case 2:11-cv-14328-JEM  Document 75  Entered on FLSD Docket 08/17/2017  Page 20 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page 20 of 52

46.     Defendants' executives endeavored to instill the mindset throughout each Defendants' office that increasing enrollments of Medicare beneficiaries took precedence over the judicious application of Medicare certification requirements. Defendants' Executives also established an office environment where personnel feared reprisal, including termination, if Medicare patient census levels were not maintained at increasingly high levels.

47.     The policies, procedures and protocols implemented by Defendants' Executives improperly influenced medical decisions such that Defendants' corporate culture discouraged the judicial application of Hospice appropriateness guidelines, fueled in part by fear of Defendants' Executives firing employees for questioning admission decisions.

48.     Defendants tracked each Medical Director's admissions on a monthly basis, as a way of assessing compliance with Defendants' expectations. Defendants emphasized an expectation of referrals in numerous ways.   For instance, in the Fall of 2009 Dr. Benson instructed the Admitting Department, as well as the Treasure Coast Hospice Physicians, that Defendants needed over 600 referrals before the end of the year and that no referrals should be refused.  When Relator-Plaintiffs objected to both Dr. Benson and  Dr. Maison regarding the impropriety of such a "*soft*" admissions policy, they were specifically informed by Dr. Maison to "*not ask questions*" or "*make noise*" about this issue.

49.     As a direct and proximate result of Defendants' corporate policies and practices, each Defendant's office Patient Census was filled with Medicare beneficiaries who were known not to be eligible for the Hospice benefit. In turn, Defendants routinely submitted false and fraudulent Hospice reimbursement claims to Medicare (through its fiscal intermediary) for services provided to those beneficiaries.

Case 2:11-cv-14328-JEM  Document 75  Entered on FLSD Docket 08/17/2017  Page 21 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **21** of **52**

50.     In addition, Defendants maintained false and fraudulent records and statements concomitantly with those claims, including the certification on each such claim that it was eligible for reimbursement.

1.      **Certification of Medicare Beneficiaries Without the Required Clinical Basis.**

51.     Medicare regulations require Hospice Medical Directors to consider beneficiaries current, clinically relevant information in performing the initial certification of beneficiaries' terminal illness. 42 CFR § 418.25.

*52.*     The required clinically relevant information includes a current medical history that supports the admitting diagnosis and the physician's certification of a terminal prognosis. 42 CFR § 418.74(a)(5). A clinical record is not complete without a physician's history and physical. *Id.*

53.     Defendants, in furtherance of their fraudulent Medicare billing scheme, routinely certified Medicare beneficiaries as Hospice appropriate in the absence of relevant clinical records. For instance, Defendants' physicians were often required to sign Medicare initial Certification forms (such as The Certificate of Terminal Illness/Attending Physician Certifying Statement) **without any medical history** to reference or rely upon.  When Relator-Plaintiffs or other TCH Physicians objected to policies which leniently permitted patients to be admitted who were not qualified for Hospice Care, and advised Defendants that submission of claims for payment for such patients was fraudulent and in violation of the law, Defendants, through Dr. Burkarth, instructed Relator-Plaintiffs and the TCH Physicians to refrain from *"causing trouble"*. And, when Relator-Plaintiffs suggested to Dr. Burkarth and others that Relator-Plaintiffs might be able to admit a patient if they had more information, and could

Case 2:11-cv-14328-JEM   Document 75   Entered on FLSD Docket 08/17/2017   Page 22 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **22** of **52**

review the Medical records or at least examine the patient before being forced to certify the patient, sight unseen, chart unread, such suggestions were routinely rejected by Defendants.

54.     Internal compliance audits of patients' clinical records conducted by Defendants in the usual course of business corroborate Defendants' systemic certification of Medicare beneficiaries for Hospice care without the requisite current and relevant medical history.

A.     For example, bi-annual audits of Defendants' Stuart office by an external auditor, ACEVEDO & ASSOCIATES, the auditor found multiple irregularities in the patient charts audited because many of the charts contained no history or physical evaluation and/or contained improper documentation to support  the amount billed to Medicare (too much or too little was documented).  Likewise, TCH's internal Quality Assurance/Quality Improvement investigation by the Risk Management Department found similar irregularities in patient charts. The employees that conducted TCH's Quality Assurance Investigation advised the executive medical board of the irregularities and advised them that the practices resulted in illegal billing of Medicare charges and needed to be corrected. The executive medical board ignored the reports and instead attempted to cover-up and hide the illegal billing practices and procedures.

55.     Another way in which Defendants circumvented the requirement for proper history and patient physicals was to have their Medical Directors generate a baseless history and physical and admission criteria data to substantiate the terminal prognosis when patients failed to exhibit any objective signs or symptoms of a terminal illness.

56.     Many patients whose terminal illnesses were fraudulently certified received Medicare funded Hospice care for extraordinarily long lengths of time, revealing that

Case 2:11-cv-14328-JEM   Document 75   Entered on FLSD Docket 08/17/2017   Page 23 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **23** of **52**

the certifications were intentionally premature. For example, one female patient admitted on or about 03/05/08 with diagnosis of "Chronic Airway Obstruction, Not Elsewhere Classified" was a Medicare beneficiary certified as Hospice appropriate by Defendants' Martin Hospice office without supportive certifying data in her patient chart, she was subsequently fraudulently recertified **for four consecutive years.**

57.     Defendants' Certifications that were signed without a pertinent history and physical were clinically baseless and lacked sound medical basis. As Defendants' Executives and office personnel well knew, Medicare relied upon these intentionally falsified records in paying the claims made by Defendants for Hospice services rendered to Medicare beneficiaries.

58.     Defendants' persistent failure to obtain a current, relevant medical history for patients certified under false pretenses was an integral component of Defendants' corporate scheme to maximize enrollments of Medicare patients. As Defendants well knew, those Medicare patients were not eligible for the Hospice benefit under any legitimate, objective application of Hospice eligibility criteria.

### 2.     Falsification of Attending Physician Certifications.

59.     Attending physicians must participate in the initial Certification process and are required to certify in writing that the beneficiary is terminally ill, and must identify the terminal diagnosis. 42 CFR §418.22(c)(1); Social Security Act, §1814(a)(7)(A).

60.     As such, the Attending Physician's Certification operates as a *"check and balance"* to ensure that an independent physician with personal, intimate knowledge of a patient's medical history will certify the existence of a terminal illness.

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **24** of **52**

61.     For obvious reasons, this regulation hampered Defendants' enrollment of Medicare beneficiaries who were not terminally ill; therefore, Defendants implemented policies and procedures to circumvent it or completely ignored such regulations.

62.     For instance, Defendants often had the physician liaisons, with the assistance of admitting nurses, make the initial assessments of Hospice appropriateness without input from the Attending Physician or even Defendants' medical personnel or Hospice Physicians.

63.     Thus, for prospective enrollees with an independent Attending Physician, Defendants often falsified Medicare initial Certification paperwork by requiring their Physicians to sign the Certification instead of the Attending Physician.

64.     Medicare relies upon the Attending Physician's Certification of his or her patient's terminal illness in paying Hospice reimbursement claims. Defendants falsified this essential Medicare record in furtherance of getting its false Hospice reimbursement claims paid and in so doing violated the False Claims Act.

**B.      Fraudulent Re-Certifications of Medicare Beneficiaries.**

65.     As explained above, a Hospice provider must periodically obtain a written recertification of beneficiaries' terminal prognosis from either the Medical Director or Physician Member of the IDT.  A written recertification must be obtained in writing before a provider can submit reimbursement claims to Medicare. *See* 42 CFR Part 418.22 (c)(1) and (2).

66.     Medicare relies upon Hospice physicians' recertification in paying Hospice reimbursement claims submitted by the provider.

Case 2:11-cv-14328-JEM   Document 75   Entered on FLSD Docket 08/17/2017   Page 25 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **25** of **52**

67.    Defendants' recertification practices purposefully failed to ensure beneficiaries' Hospice appropriateness was met at the time of recertification.  These practices include, but are not limited to, the following:

A.    Training   employees   to   falsify   patient   care   notes   by mischaracterizing patient symptoms and characteristics in  an effort to create supporting clinical documents that "*paint  a picture*" favorable for recertification for patients, who in truth, were stable and chronic, but not terminally ill;

B.    Making   intentionally   erroneous   determinations   of   Medicare beneficiaries' life  expectancy  for  the  purpose  of  meeting  Medicare's  eligibility requirements;

C.    Using statistical data or a BMI index or a Fast Scale index, rather than the actual medical condition of the patient or any evaluation of the patient, for the purposes of qualifying the patient for Medicare eligibility;

D.    Changing  patients'  questionable  initial  "soft"  diagnosis  of "Debility, unspecified" to a more specific diagnosis (which may not even be valid) when patients were  on the verge of being discharged as not Hospice appropriate, or who had been maintained on service for an extended and therefore suspect length of time;

E.    Placing Medicare beneficiaries determined to be no longer Hospice appropriate on a "*Transitions Plus*" (formerly H12) program for an entire recertification period or longer to prolong Medicare reimbursements rather than discharging the patients as required by Medicare regulation;

F.    Using the Medicare Appeals process to inappropriately delay the final decision to transition a patient out of Medicare and/or subvert the propriety of the

Case 2:11-cv-14328-JEM  Document 75  Entered on FLSD Docket 08/17/2017  Page 26 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **26** of **52**

Appellate process by utilizing "*friendly*" subcontractors to recertify Medicare appropriateness;

        G.      Requiring that Non-Attending and Non-Evaluating Physicians sign and recertify patients as Hospice appropriate when said physician(s) had not evaluated the patient for continuing Hospice appropriateness; or, in the alternative, having someone sign as the Medical Director to certify Medicare appropriateness when that person was not, in fact, the actual Medical Director; and

        H.      Back-dating the CTI/APCS so it looks like the Attending and/or Medical Director certified the patient prior to the missed certifying deadline date to cover-up untimely recertification paperwork. This practice was undertaken solely to create the necessary records to falsify eligibility of Hospice reimbursement claims that were, in truth, not eligible for reimbursement because a written physician certification had not been obtained prior to providing the services billed to Medicare.

        68.      Each Medicare-accepted Hospice diagnosis has its own set of Certification criteria. Alzheimer's/dementia were one of the most often abused "*terminal*" diagnoses. Pursuant to the criterion for terminal stage Alzheimer's, a patient was not certifiable as terminally ill if he/she could:  walk, even if assistance was required; speak more than 6 words; and/or feed him/herself.

        69.      During Interdisciplinary Team (IDT) Staff conferences at the Stuart office attended by Relator-Plaintiffs, Defendants' employees regularly commented about the large number of Hospice inappropriate patients, estimated by some employees to be 50 to 70 patients. Rather than discharge inappropriate patients, Defendants' personnel at the Stuart office were given a "*120 day window*" (the equivalent of two Medicare recertification periods) to "*find a*

Case 2:11-cv-14328-JEM  Document 75  Entered on FLSD Docket 08/17/2017  Page 27 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **27** of **52**

*way*" to make the patients Hospice appropriate. Ultimately, when many physicians refused to participate in that scheme, Defendants manipulated the results at Recertification Conferences by scheduling the Conferences at times when the specific Attending Physician had scheduling conflicts, making it impossible for him/her to attend, thereby creating an opportunity to approve the recertification in that physician's absence;  and ultimately removed recertification from the purview of the physician and specifically delegated it to the nursing staff, absent any physician involvement.

70.     The failure to discharge inappropriate patients also occurred regularly at Defendants' other offices: The Hospice recertification process did not ensure compliance with "*Hospice appropriateness*" relevant guidelines. The recertification of patients was often made so late in the process that almost all patients could not be discharged in a timely fashion; and patients who were determined to be stable and not appropriate for continued Hospice care received "*a visit by the Medical Director in an effort to find some evidence of a recent illness or disease progress that would justify continuation of Hospice service*". If no evidence was found, the patient was put on a "*Transition Plus*" (formerly H12) program which extended the patient's stay by as much as two months before discharge.

71.     To cure the systemic problems with Defendants' recertification process, Defendants' Quality Assurance/Investigation Department found that Defendants should, among other things, make the following changes, all of which were ignored or never implemented:

A.     the recertification procedure should be revised so that symptoms of disease progression are properly documented and the recertification assessments are properly made by medical personnel with sufficient lab tests and other diagnostic information;

Case 2:11-cv-14328-JEM  Document 75  Entered on FLSD Docket 08/17/2017  Page 28 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **28** of **52**

B.      if a patient is determined to be ineligible for re-certification, the discharge planning process should be initiated immediately so that the discharge planning is completed prior to the beginning of the next certification;

C.      the care planning process should be changed to ensure that all IDT members, including the Medical Director and physician, feel free to openly discuss the patient's condition and status as it relates to admission and recertification for Hospice care; and

D.      a process should be put in place to ensure that medical records include all documentation necessary to support a terminal diagnosis and prognosis, as required for Hospice care certifications and re-certifications.

### 1.      <u>Employee Training to Falsify Patient Clinical Information</u>.

72.      Pursuant to Medicare Hospice regulations, Hospice staff must document patient visits. *Id.* 418.22 (d)(2). Progress notes are one example of Defendants' patient documentation.

73.      Patient documentation is critical to the legitimate recertification of Medicare beneficiaries. To be appropriately recertified, beneficiaries' ongoing clinical documentation must support the patient's Hospice prognosis and disease progression, meaning those records demonstrate signs and symptoms of a patient's disease progression and decline. Due to the large number of inappropriate patients kept on service, however, Defendants' caregiver progress notes routinely failed to reflect the required signs of disease progression.

74.      Relator-Plaintiffs and other TCH Physicians were regularly directed by Defendants' supervisors to manipulate patient documentation for the purpose of substantiating

Case 2:11-cv-14328-JEM   Document 75   Entered on FLSD Docket 08/17/2017   Page 29 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **29** of **52**

continued Hospice eligibility for Medicare patient, and Relator-Plaintiffs and other nursing staff were directed to "*chart anything*" to keep the patient on service without regard for whether the symptom or condition had anything to do with the patients' "*terminal*" diagnosis.

> ## 2.   Fraudulently Changing Patients "Terminal" Diagnosis.

75.     Another means by which Defendants falsely recertified patients as Hospice eligible was to change patients' terminal diagnoses at the time of recertification.

76.     More specifically, in the course of reviewing a patient's medical records for continued eligibility, if records established that the patient was not terminally ill (the patient had stabilized or improved), Defendants' protocol was for the staff to find an alternative terminal diagnosis that could arguably be supported by the documentation.

77.     Although the patients may have exhibited some tangential indicia of symptoms pertaining to the new diagnosis, had Defendants performed an independent, objective evaluation of the Medicare Hospice criterion, the patients would not have qualified as terminally ill under the new diagnosis selected.

78.     When a provider such as one of the Defendants submits reimbursement claims for numerous patients with suspect lengths of stay, the fiscal intermediary sometimes red-flags those claims and withholds payment until they can be scrutinized for eligibility. The first step in this process is called an additional development request, or *"ADR,"* pursuant to which the fiscal intermediary submits a request for patient clinical documentation to substantiate the representations made in the claims submission.

79.     Defendants routinely changed the diagnosis of patients who had been fraudulently recertified for aberrantly long periods in order to avoid the ADR scrutiny of Defendants' fiscal intermediary.

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page 30 of 52

80.     Relator-Plaintiffs regularly participated in case conferences during which the patient's plan of care and medical conditions were discussed for the purposes of determining the patient's future care.    TCH's Director of Admissions and Director of Nursing and VP of Compliance (Martha Lassiter) and VP of Nursing Services (Carol Taylor Moore) also attended these case conferences.

81.     During these case conferences, Relator-Plaintiffs regularly notified those present about patients, who, based upon their personal patient assessments, did not meet Medicare Hospice eligibility criteria and should therefore have been discharged.     Despite Relator-Plaintiffs' valid clinical support for discharging non-terminal patients, VP of Compliance (Martha Lassiter) and VP of Nursing Services (Carol Taylor Moore) and others including the Marketing Department staff prevented the patients' discharge.

82.     Neither the Medical Director nor the physician member of the IDT were involved in these case conferences and there was no physical examination of the patient or review of the medical records by the doctors prior to the RN Case Manager being directed to find another diagnosis to support the recertification.

83.     Relator-Plaintiffs and other Physicians, who were employed in Defendants' offices, were also directed to find new diagnoses for patients whose condition under the current diagnoses would not support eligibility for the Medicare Hospice program. Relator-Plaintiffs have personal knowledge of these facts because they provided Hospice services to these patients. For example, Relator-Plaintiff SIMONS raised these concerns during an IDT discussion of a female patient which will be identified only as "Ann S." However, Dr. SIMONS' concerns were dismissed.    Defendants kept Patient Ann S. with the Dementia diagnosis while

Case 2:11-cv-14328-JEM Document 75 Entered on FLSD Docket 08/17/2017 Page 31 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page 31 of 52

Defendants worked to identify another, alternative diagnosis more likely to justify Hospice care. Patient Ann S.'s diagnosis was subsequently changed to ES Cardiac Disease.

## VI.  IMPROPER MANIPULATION OF CENSUS TO ADMIT PATIENTS WHO WERE ALREADY PATIENTS

84.     Defendants received payment for each day a patient received Hospice care.  However, if Defendants terminated/transferred the patient's care on a particular day, and, on the same day, re-admitted a patient, Defendant could in effect receive two (2) payments for the same patient on the same day (one for the day said patient was receiving the services and an additional payment for being "readmitted").

85.     Defendants on a regular and routine basis would manipulate the Census Data of patients admitted for Hospice care by terminating hospice patients from one facility and re-admitting them to another on the same day and thereafter fraudulently bill Medicare for two days of care for the same patient for the same day. Plaintiff-Relators have been able to identify that during the period of 2008-2009 at least 21 Okeechobee patients were the subject of such fraudulent scheme.

## VII.  ESTIMATED LOSSES SUSTAINED BY THE UNITED STATES

86.     The Key metric for the calculation of losses sustained by the United States as a result of Defendants' Medicare fraud is the average daily per patient per diem reimbursement paid to Defendants for all levels of Hospice care provided to the patients treated by each of its offices.

87.     For the purposes of this damages analysis, the average per diem rate for routine care of $250.00 for each patient is used. This is a conservative number because the average per diem rate may have been higher in other years depending on the level of care

\\fs2\files\simons v hospice of treasure coast 11_002\comp\amended complaint 170816chris.docx

Case 2:11-cv-14328-JEM Document 75 Entered on FLSD Docket 08/17/2017 Page 32 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page 32 of 52

provided to each patient and does not include other reimbursable costs for physicians' services, medications and medical devices.

88.     The estimated total loss sustained by the United States as a result of Defendants' fraudulent scheme is probably in the $72 million range, or around 44% of Defendants' total estimated $163 million in Medicare revenues for 2006 to 2011. A full calculation of the damages will require an extensive review and audit of all pertinent medical and billing records.

## VIII.   EVENTS LEADING TO TERMINATION OF DR. SIMONS

89.     During the fall of 2009 TCH was notified by the Agency for Healthcare Administration (ACHA) that TCH was under serving the people in its service area and that TCH was in danger of losing their Certificate of Need (CON) as the sole provider of Hospice services in Martin, St. Lucie and Okeechobee counties.

90.     As a result of ACHA's findings, CEO Lou Benson instructed Director of Admissions Diane Wright, as well as the TCH physicians that TCH needed over 600 referrals before the end of the year and to not refuse any referrals. Dr. SIMONS objected to this policy by advising Dr. Benson and Dr. Maison of the inappropriateness of the "*Soft*" admissions. In response, Dr. SIMONS was instructed by Dr. Maison that Dr. Benson to certify all "*Soft*" admissions and "*not cause trouble*".

91.     During the spring 2009 Lou Benson instructed Director of Admissions Diane Wright to transfer the entire Patient Census of the Big Lake Hospice Branch of TCH to the St. Lucie County Branch of TCH and admit all such patients as new patients even though they were already on TCH's census in the TCH Martin county system, thereby making the state auditors (ACHA) think that they were all new admissions. Dr. SIMONS contacted Dr. Robert

\\fs2\files\simons v hospice of treasure coast 11_002\comp\amended complaint 170816chris.docx

Case 2:11-cv-14328-JEM  Document 75  Entered on FLSD Docket 08/17/2017  Page 33 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **33** of **52**

Anderson, Associate Medical Director, and advised him that he would not sign the transfer order

and Dr. Anderson agreed that the whole idea of transferring the patients and counting them as a

new admission was wrong and that he would not sign the admission orders either.

92.     During the spring 2010, CEO Dr. Lou Benson instructed Director of

Admissions Diane Wright that every person admitted to or discharged from the Hospice House

during this period be given a new patient number and readmitted as a new patient, thereby

making the state auditors think that they were all new admissions. (TCH fraudulently submitted

to the state that they had 2 additional admissions when in fact all it was, was a transfer.) This

practice also resulted in double billing for the same patient for Medicare Hospice services for the

day of the transfer. Dr. SIMONS objected to this illegal practice and raised the this issue with the

Medical Director, Dr. Maison, who instructed Dr. SIMONS that he was told by Dr. Lou Benson

to not ask any more questions and "do as he was told".

93.     During the spring 2010, Dr. SIMONS refused to allow for the transfer of a

critically ill, known IV drug abusing TCH patient to the Hospice House. In response,

Dr. Simons was told by COO Janine Cacciatore, RN, V.P. of Compliance Martha Lassiter and

Carol Taylor-Moore, RN – VP Clinical Services, that they demanded that he transfer the patient

to Hospice House even though they knew that the patient could die and even though they knew

that the Hospice House nurses were not capable or trained to care for patient.  Dr. SIMONS

refused and objected and advised them that he had given a direct order to at least 2  licensed RNs

(Janine Cacciatore, RN and Carol Taylor-Moore RN)  that they assist him in making sure that

patient was sent to the ER/Psych Hospital where she could receive the appropriate emergent

medical care she needed. Instead of assisting Dr. SIMONS and complying with his doctor order,

Dr. SIMONS was told that they would not allowed to follow the order and hung up the phone,

Case 2:11-cv-14328-JEM  Document 75  Entered on FLSD Docket 08/17/2017  Page 34 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **34** of **52**

thereby abandoning the patient and refusing to give the patient the care she needed. Dr. SIMONS had no recourse but to drive out to the patient's home with the Martin County Sheriff Deputy and Martin County EMS to speak to the patient and get her safely to the ER. The patient was supposed to go directly to The Saint Lucie Hospital under the "*Marchman Act*" to a hospital bed Dr. SIMONS had secured for her, but due to the delay in getting to her house (caused by COO Janine Cacciatore, RN, VP of Compliance Martha Lassiter and Clinical Director Carol Taylor-More, RN) the patient bed that Dr. SIMONS had procured for the patient was lost and the patient had to be sent to the ER at Martin Memorial Medical Center instead.  Later that day, Dr. SIMONS reiterated his objections by expressing his concerns to Lou Benson about the refusal of Janine Cacciatore, Martha Lassiter and Carol Taylor-Moore to comply with Dr. SIMONS' direct order and request for assistance. Dr. Benson stated that he would get back to Dr. SIMONS the next day, yet he never called Dr. SIMONS back and had Dr. Maison tell Dr. SIMONS that he was not going to do anything about it and that he would understand if Dr. SIMONS needed to find another job.

94.     On or about December 21, 2010, Dr. SIMONS, met with Dr. Burkarth and Mrs. Silvermoon Taggart (Billing Dept.). At the meeting everyone discussed new information recently learned at a Medicare Billing & Coding Conference attended by Mrs. Silvermoon. The attendees then reviewed Dr. SIMONS' current documentation and the impact this new information had on "*billing for time*" and level of complexity.  Dr. Burkarth decided that Dr. SIMONS was no longer allowed to "*bill for time*" in the Hospice House because it might bring TCH under scrutiny by the OIG (especially in light of the other Medicare fraud/overbilling for crisis care TCH had committed and recently uncovered) and subject TCH to an audit. Dr. SIMONS then showed Dr. Burkarth and Mrs. Silvermoon the Medicare regulation about "*billing*

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page 35 of 52

*for time*" and showed them that he was allowed to "*bill for time*" and that it was especially appropriate in the HH where the patients and the needs of the family were much more complex. Regardless, Dr. SIMONS was then informed that if he continued to "*bill for time*", his billing sheet would be down-coded and submitted to Medicare on complexity only without his knowledge. Dr. SIMONS objected and stated that it was unfair to do so, and that Jean Acevado (Billing consultant) and Dr. Maison stated that physicians should "*bill for time*" if greater than 50% of their visit is counseling and coordination of care time.  Dr. Burkarth and Mrs. Silverman Taggart again stated their previous position and ended the discussion on that issue. In closing, Dr. SIMONS stated that he would not keep or admit patients into the Hospice House that did not qualify for GIC level of care. Dr. Burkarth and  Mrs. Silvermoon Taggart ordered Dr. SIMONS to "*be a team player*" and keep and admit unqualified patients for GIC services for a few days "*to be thorough*".  Dr. SIMONS refused to do so and advised them to do so was unethical, illegal and/or immoral and that he would not live in the "*grey*" area and would not "*fudge*" his notes in any way. He then implored TCH to do the right thing and follow the law. Dr. Burkarth responded by stating that Dr. SIMONS was too strict and that he should be more "*open minded.*"  As the meeting was drawing to a close,   Dr. Burkarth stated that Dr. SIMONS was an excellent physician and that he had a lot of good questions. Dr. Burkarth also stated that Dr. SIMONS' documentation was "*actually pretty good*" and that it was really a "*billing for time*" issue. She then stated that she would pay for Dr. SIMONS to go to a billing conference provided by Jean Acevado on 1/12/10 -1/13/10 and that Dr. SIMONS could ask his questions there.

95.     On or about 12/21/10 Dr. SIMONS engaged in new Contract Negotiations with Dr. Burkarth. During the negotiations, Dr. SIMONS was told that all existing TCH physicians were asked to sing a new "*Physician*" contract which required them to sign all CTI's

\\fs2\files\simons v hospice of treasure coast 11_002\comp\amended complaint 170816chris.docx

Case 2:11-cv-14328-JEM   Document 75   Entered on FLSD Docket 08/17/2017   Page 36 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **36** of **52**

regardless of whether Medicare compliance obligations had been met. The new Physician contract would require that all TCH hospice physicians must sign the CTI's and that they each see an average of 6 patients/day. Dr. SIMONS was told that with the new contract in place, that he and all other physicians could not refuse to sign the CTI's (even if the patient didn't qualify for Hospice services) and that if he so refused he could be terminated. Dr. SIMONS refused to sign the contract in its present form and asked to discuss it further with Dr. Lou Benson and Dr. Burkarth. Dr. SIMONS was informed that there was no further discussion and that he was required to sign and comply by January 10, 2011. Dr. SIMONS then called Dr. Lou Benson and expressed his concerns about the contract.

96.     On or about 12/21/10 Relator-Plaintiff, Dr. SIMONS placed a phone call to Associate Medical Director Dr. Anderson. During the call, Dr. SIMONS summarized his previous meeting with Dr. Burkarth and Silvermoon. Dr. SIMONS again stated that he could not and would not keep patients in the Hospice House that were not GIC appropriate and would not "*fudge*" the record to do so.  Dr. SIMONS then asked Dr. Anderson to transfer SIMONS out of the Hospice House and be put back on the "*Road*". Dr. SIMONS also reiterated his refusal to sign the CTI/APCS without examining the patient and/or reading the medical file first as required by Medicare regulations. Dr. Anderson responded by stating that "*we all do it, so what is the big deal.*" Dr. SIMONS then stated that he would not be a part of Medicare fraud and that he did not want to be in the Hospice House anymore. Dr. Anderson then stated that he would let Dr. Burkarth know when she got back from vacation and let Dr. SIMONS know what they would do.

Case 2:11-cv-14328-JEM  Document 75  Entered on FLSD Docket 08/17/2017  Page 37 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page 37 of 52

97.     On or about December 22, 2010, Dr. SIMONS sent an E-mail to Dr. Burkarth and Dr. Anderson which reiterated his objections and refusals to commit Medicare fraud and summarizing his concerns about inappropriate billing, coding and admissions.

98.     On or about December 23, 2010, Dr. Benson called Dr. SIMONS looking for his current patient documentation. Dr. SIMONS told Dr. Benson that he would send it in even though it was not due until January 3, 2011 (per policy). Dr. Benson then stated that he "*didn't care about the policy that was in place, that he sets the policy around here and that he was demanding that Dr. SIMONS send it in right now*". Dr. SIMONS sent in all the documentation and billing by 4 P.M. as Dr. Benson had demanded.

99.     On or about January 4, 2011, Dr. SIMONS placed a phone call to Pam Miller (Director of Patient Billing). Dr. SIMONS placed the call to let Ms. Miller know that the NPPES (National Plan and Provider Enumeration System) still showed only Dr. Burkarth and Dr. SIMONS were linked to TCH, and that all of the other physicians were still linked to their old employers. Ms. Miller told Dr. SIMONS that she thought that was taken care of already, and that the deadline for linking all the physicians was extended. Dr. SIMONS also told Ms. Miller that the doctors were being asked to sign certifying statements (CTI/APCS) on patients that they did not know and have never read the record. Dr. SIMONS also told her that he and the other physicians were also asked to sign backdated certifying statements so that TCH could bill for services rendered before the patient was legally certified as "Hospice Eligible". Ms. Miller told Dr. SIMONS that she would "*look into it*."

100.    On or about January 6, 2011, Dr. SIMONS attended a Physician meeting. Present at the meeting were the following Doctors: Anderson, Buttles, Dr. COOK, Craddock, Hutson, Peddicord and Dr. SIMONS. Others in attendance included Lou Benson, Susan Decuba,

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **38** of **52**

Diane Wright, Kathy O'hanna and Bernie Fischer as well as a Hospice consultant, Frank DiPace. The stated goal of the meeting related to the Hospice consultant discussing various ways to improve the physician's role in admitting and keeping patient's on Hospice services. At one point during the meeting, Dr. Benson asked for input from the physicians. At that time, Dr. SIMONS, to which Dr. COOK joined,  made the following objections to ongoing illegal practices and procedures:

> A.     Dr. SIMONS and Dr. COOK objected to the fact that on many occasions they and/or hospice physician were asked to admit patients into the service (Sign the CTI/APCS) for patients that were not qualified for hospice care, and that when they and the physicians complain to their boss, Dr. Burkarth, they are told to admit the patient and don't cause trouble.  Dr. SIMONS explained that he and/or the other physicians might be able to admit the patient if they had more information, and could review the medical record or at least examine the patient before being forced to certify the patient, sight unseen, chart unread. Dr. SIMONS expressly told Dr. Benson that to make the physician sign the CTI/APCS without seeing the patient or having read the medical record was illegal.

> B.     Dr. SIMONS and Dr. COOK objected to the fact that medical records are altered and Medicare fraudulently billed when they told Dr. Benson that the medical record is illegally changed by switching the Attending of record to one of the TCH physicians and submitting billing to Medicare, which they contended and asserted was and is illegal. Dr. SIMONS Dr. COOK also stated that the patient selected Attending Physician is not notified of the illegal change.

Case 2:11-cv-14328-JEM  Document 75  Entered on FLSD Docket 08/17/2017  Page 39 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page 39 of 52

C.      Dr. SIMONS objected to the fact that many times he and other physicians are told to sign the APCS as the "Attending Physician" of record, when they are not the Attending of record. Dr. SIMONS then told Dr. Benson that it was illegal to certify a patient that he or other physicians had never met nor would ever meet and refused to participate in such illegal practices.

D.      Dr. SIMONS objected to the fact that the he and/or other physicians are required by Dr. Burkarth to fraudulently recertify a patient as the "Medical Director" when in fact they are not the Medical Director, thereby bypassing the Attending certifying process, which Dr. SIMONS contended was against the law and he refused to participate in such illegal practices.

E.      Dr. SIMONS objected to the fact that hospice physicians are asked to admit patients into the Hospice House who do not qualify for GIC level of care, and that it was illegal to do so and that he would not falsify the medical records or take 3 days to decide if the Patient qualified for GIC as he and other physicians were ordered to do.

101.    Other physicians present at the January 6, 2011 meeting, including Dr. Jim Buttles, Dr. Randolph Peddicord, Plaintiff-Relator LEWIS COOK, Dr. Brent Hutson and Dr. Richard Craddock also voiced the same objections as Dr. SIMONS.

102.    After Dr. SIMONS voiced his objections, concerns and made it clear he refused to participate in any illegal activity, Dr. Benson stated that he was grateful for Dr. SIMONS' comments and suggestions. He then declared that he was going to have Dr. SIMONS chair a new committee to address these concerns and implement some of his ideas right away.

\\fs2\files\simons v hospice of treasure coast 11_002\comp\amended complaint 170816chris.docx

Case 2:11-cv-14328-JEM Document 75 Entered on FLSD Docket 08/17/2017 Page 40 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page 40 of 52

103. On or about January 7, 2011, Dr. SIMONS ran into Dr. Benson in the hallway of TCH and had a conversation with him. During this conversation, Dr. Benson again stated how appreciative he was about Dr. SIMON'S and dedication to THC and how he looked forward to meeting with him that coming Friday to begin work on the new committee. Dr. SIMONS replied that he was going to send Dr. Benson an E-mail summarizing the issues he raised in the January 6, 2011 meeting, but was instructed by Dr. Benson not to do so.

104. On January 13, 2011 Dr. SIMONS was again asked to sign an APCS of a patient that he had never met, so he asked the supervisor of medical records to get the medical record, and then he would sign the APCS if they met the criteria for Hospices services. The next day, January 14, 2011, Dr. SIMONS reviewed the chart and was presented with a reprinted APCS to sign. When Dr. SIMONS looked at the APCS, he was shocked to find that the latest APCS had a preprinted date of January 11, 2011 next to the signature line for both the Attending and the Medical Director. Dr. SIMONS brought this issue to the attention of the Supervisor of Medical Records, Angie Petagno and the Director of Medical Records, Tami Gabriel, both of whom denied updating the CTI/APCS in the computer and stated it was their opinion that somehow the computer automatically forces a fraudulent date if the computer determines that a CTI/APCS deadline has expired without the appropriate signatures. This fact was verified when Tami Gabriel went into the computer and pulled up the audit trail and it showed that the record was not updated by anyone who went through the standard update screens. It only showed the 2 days that the APCS was printed (1/13/11 and 1/14/11) with no other edits made, but there in the data record it showed that the Medical Director and the Attending Physician had signed the certifying statements on January 11, 2011. Angie Petagno stated that she did not update the record and that it would have been impossible to date the signatures on January 11, 2011 because

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page 41 of 52

The APCS and the CTI had not even been printed for the first time until January 13TH, and that the forms had yet to be signed by either Dr. SIMONS or the Medical Director. Dr. SIMONS immediately pulled Tami Gabriel and Angie Petagno into the back room and told them both that he would not sign the backdated APCS and that Tami Gabriel was obligated to advise the proper personnel and ensure no further fraudulent records were created.

105.    Shortly thereafter, on January 13, 2011, Dr. SIMONS noticed that there was a resident of the Amore Alzheimer's Dementia Center that he knew that he was not the Attending Physician of record because, in fact, the patient was still under the care of Dr. Gilderman, the patient's Attending physician.   Dr. SIMONS then called the RN Case Manager, Rhonda Centrone, who confirmed that Dr. Gilderman was still, and always had been, the patient's Attending physician. Dr. SIMONS brought this fact to the attention of both Tami Gabriel and Angie Petagano, whom confirmed that this was yet another example of where the clinical department removes the Attending of record because they had not signed the APCS on time and the TCH physician was assigned as their Attending Physician so that TCH could get the APCS signed before the deadline and bill Medicare.

106.    On or about January 14, 2011 Dr. SIMONS had a meeting with Dr. Benson – CEO, Martha Lassiter– VP Compliance and Mr. Robert Kilbride – the TCH Attorney. The meeting was a scheduled meeting set up in advance to discuss the objections, concerns and issues raised by Dr. SIMONS at the doctor meeting of January 6,01/06/11 with Dr. Benson alone.   Instead   of   a   discussion   of   those   outstanding   issues   with Dr. Benson, Martha Lassiter and Robert Kilbride the attorney for TCH were also in the room, Dr. SIMONS was told that he was being terminated for having documentation *"that was not up to Dr. Benson's standards"* and that his termination was effective immediately.

\\fs2\files\simons v hospice of treasure coast 11_002\comp\amended complaint 170816chris.docx

Case 2:11-cv-14328-JEM  Document 75  Entered on FLSD Docket 08/17/2017  Page 42 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **42** of **52**

107.    During the January 14, 2011 meeting: Dr. SIMONS protested his termination and explained to Dr. Benson that he recently had a documentation review with Dr. Burkarth and Silvermoon and that his documentation was fine.  He also told Dr. Benson that he was told that he was providing too much documentation in his notes and that it made it difficult for Silvermoon to down-code Dr. SIMONS visits like they planned to do. Dr. Benson then stated that "*the documentation was not up to his standards*". Dr. SIMONS immediately replied and said that "*I could not fudge the documentation as he wanted or write my notes in a way that allowed for Hospice to admit people into the Hospice House or into Hospice that didn't qualify*"; Dr. SIMONS told Dr. Benson that he was surprised that Dr. Benson was terminating him because Dr. Benson had just complemented him for his comments and input in front of 6 doctors, 3 directors and a VP in attendance at the January 11TH 2011 Physicians' Meeting and that Dr. Benson had stated he was going to make Dr. SIMONS Chairman of the new committee to deal with the objections and concerns he raised; Dr. SIMONS stated that he was surprised that he never heard one word about his documentation or concerns of any other kind from Silvermoon, Dr. Burkarth or Dr. Anderson at any time, and in fact that when Dr. Benson called Dr. SIMONS on December 23, 2010 looking for documentation, Dr. SIMONS sent in all the documentation and billing by 4 P.M. as Dr. Benson had requested (even though it was not due until January 3, 2011 per policy); Dr. SIMONS pointed out to Dr. Benson that all his dictation was in, his billing was current and that he was told that he was the highest rated physician in all of TCH for the past 3 years and had received exemplary reviews and evaluations throughout his 4½ year career with TCH.  Dr. Benson in response stated that Dr. SIMONS had been angry for some time and was not happy with TCH.  Dr. Benson then stated that Dr. SIMONS would be happier somewhere else. Dr. SIMONS then stated that he was not unhappy with Hospice, but was frustrated with all

\\fs2\files\simons v hospice of treasure coast 11_002\comp\amended complaint 170816chris.docx

Case 2:11-cv-14328-JEM Document 75 Entered on FLSD Docket 08/17/2017 Page 43 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page 43 of 52

the illegal billing, and inappropriate admissions he had to deal with the past 2 years; Dr. SIMONS told Dr. Benson that he had come prepared for that meeting with 8 pages of notes and solutions to the problems Dr. SIMONS had uncovered and offered them for his review. Dr. Benson immediately stated that he was not interested in the notes or his comments and he then said that the meeting was over; Dr. SIMONS then stated that if Dr. Benson was going to fire him, then they were going to have to put their reason for termination in writing. Dr. Benson immediately stated that he would do no such thing. It was at that time that the attorney spoke up and stated that they were going to allow Dr. SIMONS to resign and that they had prepared a Separation Agreement for him to review and sign and that they would pay him $30,000 to go away and not say anything disparaging about TCH to anyone; Dr. SIMONS took the agreement to review and was escorted out the door by Martha Lassiter. As they were walking out of the elevator, Dr. SIMONS stated to Lassiter that this was *"not right"*, where upon she began to cry and stated *"you know I cannot say anything."* She then took Dr. SIMONS badge, phone and showed him the door.

108. Sometime around September 2010, Dr. SIMONS initially contacted the fraud division for the federal agency responsible for investigating Medicare Fraud and reported the fraudulent billing practices. Dr. COOK contacted the same fraud investigators on multiple occasions between 1/26/11 & 1/30/11 and thereafter provided documentation and information substantiating the fraud claims set forth herein. Plaintiff-Relators thereafter filed a formal complaint (Case #3301212011001) on 12/22/10 and provided investigator, Olga Llanes, with documentation to substantiate the fraud. Following such contact, Plaintiff-Relators remained in contact with federal employees who, based upon the information provided by them, began to conduct an investigation into the claims more particularly set forth herein. From September

\\fs2\files\simons v hospice of treasure coast 11_002\comp\amended complaint 170816chris.docx

Case 2:11-cv-14328-JEM   Document 75   Entered on FLSD Docket 08/17/2017   Page 44 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **44** of **52**

through December, 2010, Dr. SIMONS provided the Medicare fraud investigators information

and documentation to establish the fraudulent billing practices and procedures, along with patient

records to show examples of the same. As a direct result of Dr. SIMONS' and Dr. COOK's

reporting of the illegal billing practices and procedures, a formal investigation was initiated and

is currently ongoing. The Investigation to date has established the truth of the allegations

asserted. On or about December 22, 2010, Dr. SIMONS advised Dr. Burkhart that he had

reported the illegal billing practices to the federal investigators and that they were conducting a

formal investigation into the illegal billing practices and procedures of TCH. Additionally,

approximately one week before he was terminated, Dr. SIMONS told Dr. Benson that he had

reported the illegal Medicare billing practices and procedures to Federal investigators and was

cooperating with them in investigating the same.. At all time prior to the time in which Dr.

SIMONS was terminated, Defendants had full knowledge of his participation in and initiation of

a formal Complaint against them with the federal and state agencies responsible for investigating

claims of fraudulent Medicare billing practices and procedures and pertaining to the False

Claims Act claims asserted herein.

## IX. COUNTS

### COUNT I
### (Violation of False Claims Act — 31 U.S.C. Section 3729(a)(1))

109.    Relator-Plaintiffs incorporate by reference and re-allege ¶ 1-108 as if fully

set forth herein. This claim is brought by Relators, JOHN SIMONS and LEWIS COOK, in the

name of the United States under the *qui tam* provisions of 31 U.S.C. §3730 for Defendants'

violation of 31 U.S.C. §3729(a)(1).

\\fs2\files\simons v hospice of treasure coast 11_002\comp\amended complaint 170816chris.docx

Case 2:11-cv-14328-JEM   Document 75   Entered on FLSD Docket 08/17/2017   Page 45 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **45** of **52**

110.     From in or about 2006 until at least December 31, 2010, Defendants knowingly presented or caused to be presented, directly or indirectly, to officers, employees or agents of the United States, false or fraudulent claims for payment or approval by the Medicare Hospice benefit program, to wit, claims for the reimbursement of Defendants' for Hospice services allegedly provided to patients by Defendants during that period.

111.     Plaintiff United States, unaware of the falsity of the claims and/or statements which the Defendants made to the United States, and in reliance on the accuracy thereof, paid said Defendants for claims that would otherwise not have been allowed.

112.     By reason of those unlawful practices described herein, substantial numbers of ineligible patients have been enrolled in Medicare's Hospice benefit program and these practices thus provided substantial profits to all of the Defendants. The Hospice services which were provided to these patients are the basis of the false and fraudulent claims presented to the United States.

113.     By reason of these unlawful practices by Defendants', as aforesaid, Doctors and other health care providers have been induced to refer numerous inappropriate patients to Defendants rather than recommending less expensive procedures or treatment options for their patients.

114.     The amounts of the false or fraudulent claims to the United States are material. Plaintiff United States, being unaware of the falsity of the claims and/or statements presented by the Defendants, and in reliance on the accuracy thereof paid and may continue to pay Defendants for Hospice services fraudulently provided under the Medicare Hospice benefit program.

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **46** of **52**

**WHEREFORE,** Relator-Plaintiffs, JOHN SIMONS and LEWIS COOK, on behalf of themselves and the United States United States, request the following relief:

(A)   Judgment against all of the Defendants in the amount of three (3) times the amount of damages the United States of America has sustained because of Defendants' actions, plus a civil penalty of $10,000.00 for each action in violation of 31 U.S.C. §3729(a)(1), and the appropriate fines and penalties for violating the protective federal laws applicable to the fraudulent and false conduct, as well as the cost of this action with interest;

(B)   That Relator-Plaintiffs, JOHN SIMONS and LEWIS COOK, be awarded all costs incurred, including reasonable attorneys' fees;

(C)   That Relator-Plaintiffs, JOHN SIMONS and LEWIS COOK, be awarded an appropriate amount for disclosing evidence or information that the United States did not possess when this action was brought to the United States. The appropriate amount is not greater than twenty-five percent (25%) of the proceeds of the action or settlement of a claim. The amount awarded to Relator-Plaintiffs, JOHN SIMONS and LEWIS COOK also includes the results of United States' actions or the settlement of claims resulting from the expansion of claims through the United States' further investigation directly generated from or attributable to Relator-Plaintiffs' information; and

(D)   Such other relief as this Court deems just and appropriate.

## COUNT II
### (Violation of False Claims Act – 31 U.S.C. Section 3729(a)(2))

\\fs2\files\simons v hospice of treasure coast 11_002\comp\amended complaint 170816chris.docx

Case 2:11-cv-14328-JEM   Document 75   Entered on FLSD Docket 08/17/2017   Page 47 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **47** of **52**

115.    Relator-Plaintiff incorporates by reference and re-alleges ¶ 1-108 as if fully set forth herein. This claim is brought by Relators, JOHN SIMONS and LEWIS COOK, in the name of the United States under the *qui tam* provisions of 31 U.S.C. §3730 for Defendants'' violation of 31 U.S.C. §3729(a)(2).

116.    From in or about 2006 until at least December 31, 2010, all of the Defendants knowingly made, used or caused to be made, false records or statements to get false or fraudulent claims paid or approved by the United States, in violation of 31 U.S.C. §3729(a)(2).

117.    Plaintiff, United States, unaware of the falsity of the records and/or statement or statements which Defendants made to the United States, and in reliance on the accuracy thereof, paid said Defendants for claims that would otherwise not have been allowed.

118.    By reason of the unlawful practices described herein, namely, the production and use of false and fraudulent records to have ineligible patients enrolled in Medicare's Hospice benefit program and is to support the payment of false and fraudulent claims made to the United States, numerous false and fraudulent claims have been paid by the United States.

119.    The amounts of the false or fraudulent claims to the United States are material.  Plaintiff, UNITED STATES, being unaware of the falsity of the records and/or statements presented by the Defendants, and in reliance on the accuracy thereof, paid and may continue to pay Defendants for Hospice services fraudulently provided under the Medicare Hospice benefit program.

Case 2:11-cv-14328-JEM  Document 75  Entered on FLSD Docket 08/17/2017  Page 48 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **48** of **52**

**WHEREFORE,** Relator-Plaintiffs, JOHN SIMONS and LEWIS COOK, on behalf of themselves and the United States, request the following relief:

(A)     Judgment against all of the Defendants in the amount of three (3) times the amount of damages the United States of America has sustained because of Defendants' actions, plus a civil penalty of $10,000.00 for each action in violation of 31 U.S.C. § 3729(a)(2), and the appropriate fines and penalties for violating the protective federal laws applicable to the fraudulent and false conduct, as well as the cost of this action with interest;

(B)     That Relator-Plaintiffs, JOHN SIMONS and LEWIS COOK, be awarded all costs incurred, including reasonable attorneys' fees;

(C)     That Relator-Plaintiffs, JOHN SIMONS and LEWIS COOK, be awarded an appropriate amount for disclosing evidence or information that the United States did not possess when this action was brought to the United States. The appropriate amount is not greater than twenty-five percent (25%) of the proceeds of the action or settlement of a claim. The amount awarded to Relator-Plaintiffs also includes the results of United States' actions or the settlement of claims resulting from the expansion of claims through the United States' further investigation directly generated from or attributable to Relator-Plaintiffs' information; and

(D)     Such other relief as this Court deems just and appropriate.

## COUNT III
### (Violation of False Claims Act – 31 U.S.C. Section 3729(a)(3))

120.     Relator-Plaintiffs incorporate by reference and re-allege ¶ 1-108 as if fully set forth herein. This Count is brought by JOHN SIMONS and LEWIS COOK in the name of the United States under the *qui tam* provisions of 31 U.S.C. §3730 for Defendants'' violations of 31 U.S.C. §3729(a)(3).

Case 2:11-cv-14328-JEM Document 75 Entered on FLSD Docket 08/17/2017 Page 49 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **49** of **52**

121. By virtue of the acts described herein, among others, all of the Defendants and executives thereof, conspired to defraud the United States by getting false or fraudulent claims allowed or paid, in violation 31 U.S.C. §3729(a)(3). The conspiracy included the following objectives and/or overt acts:

A. An Agreement among and between Defendants, as further alleged herein; and

B. Which agreement involved the provision by Defendants of policies and procedures and protocols to allow for billing of Hospice care related services for Medicare beneficiaries who were not eligible for Hospice care.

122. By reason of the unlawful practices described herein, substantial numbers of ineligible patients have been enrolled in Medicare's Hospice benefit program and these practices thus provided substantial profits to the Defendants who conspired to defraud the United States by presenting false and fraudulent claims to the United States.

123. The amounts of the false or fraudulent claims to the United States are material. Plaintiffs United States, being unaware of the conspiracy to get false and fraudulent claims allowed, paid or made payments to the Defendants based on the false records and statements provided by Defendants for inappropriate Hospice services billed to the Medicare Hospice benefits program.

**WHEREFORE,** Relator-Plaintiffs, JOHN SIMONS and LEWIS COOK, on behalf of themselves and the United States, request the following relief:

(A) Judgment against all of the Defendants in the amount of three (3) times the amount of damages the United States of America has sustained because of Defendants' actions, plus a civil penalty of $10,000.00 for each action in violation of 31 U.S.C. § 3729(a)(3), and the

\\fs2\files\simons v hospice of treasure coast 11_002\comp\amended complaint 170816chris.docx

Case 2:11-cv-14328-JEM  Document 75  Entered on FLSD Docket 08/17/2017  Page 50 of 52

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **50** of **52**

appropriate fines and penalties for violating the protective federal laws applicable to the fraudulent and false conduct, as well as the cost of this action with interest;

(B)    That Relator-Plaintiffs, JOHN SIMONS and LEWIS COOK, be awarded all costs incurred, including reasonable attorneys' fees;

(C)    That Relator-Plaintiffs, JOHN SIMONS and LEWIS COOK, be awarded an appropriate amount for initiating any formal investigation and disclosing evidence or information that the United States did not possess before Dr. SIMONS and/or Dr. COOK complained to federal authorities of the fraudulent Medicare billing practices and procedures or before this action was brought to the United States. The appropriate amount is not greater than twenty-five percent (25%) of the proceeds of the action or settlement of a claim. The amount awarded to Relator-Plaintiffs also includes the results of United States' actions or the settlement of claims resulting from the expansion of claims through the United States' further investigation directly generated from or attributable to Relator-Plaintiffs' information; and

(D)    Such other relief as this Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Relator-Plaintiffs, JOHN SIMONS and LEWIS COOK demand a jury trial on all claimss so triable as a matter of right.

CHRISTOPER C COPELAND, P.A.
824 W Indiantown Road
Jupiter, FL 33458
(561) 691-9048
E-Mail Chris@CopelandPA.com


By:  /s/ Christopher C Copeland
    Christopher C. Copeland, Esq.
    Florida Bar No. 938076

JUPITER LAW CENTER
Jupiter Creek Professional Center
1102 W. Indiantown Road – Suite 7
Jupiter, FL 33458-6813
(561) 744 – 4600
E-mail asg@jupiterlawcenter.com


By:  /s/ Adam S. Gumson
    Adam S. Gumson, Esq.
    Florida Bar No. 906948

\\fs2\files\simons v hospice of treasure coast 11_002\comp\amended complaint 170816chris.docx

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
**Page 51 of 52**

## CERTIFICATE OF SERVICE

IT IS HEREBY certified that a true and correct copy of the foregoing Amended Complaint was served via Electronic Mail to those individuals identified on the attached Service List this $\cancel{14}$ day of August 2017.

/s/ Christopher C. Copeland
Christopher C. Copeland, Esq.
Florida Bar No. 938076

United States ex rel John Simons and Lewis Cook
v. Health and Palliative Services of Treasure Coast et al.
Page **52** of **52**

## SERVICE LIST

*United States of America ex rel. John Simons and Lewis Cook v. Health and Palliative Services
of The Treasure Coast, Inc., et al,* Case No. 11-14328-Martinez/Lynch

Christopher C. Copeland, P.A.
Attn: Christopher C. Copeland
Florida Bar# 938076
824 W Indiantown Road
Jupiter, FL 33458
(561) 691-9048 (office)
(866) 259-0719 (fax)
E-mail: Chris@CopelandPA.com
Counsel for Relator-Plaintiffs

Jupiter Law Center
Attn: Adam S. Gumson, Esq.
Florida Bar No. 906948
Jupiter Creek Professional Center
1102 W. Indiantown Road, Suite 7
Jupiter, FL 33458-6813
E-mail: asg@jupiterlawcenter.com
Co-Counsel for Relator-Plaintiff

Mark A. Lavine
Assistant U.S. Attorney
United States Attorney's Office
500 S. Australian Avenue, Suite 400
West Palm Beach, FL 33401
Tel. (561) 209-1043
Fax: (561) 805-9846
E-mail: mark.lavine@usdoj.gov
Counsel for Plaintiff,
United States of America

Vanessa Reed
Attorneys, Department of Justice
Civil Division
Post Office Box 261
Ben Franklin Station
Washington, DC 20044
Tel: (202) 514-7372
Fax: (202) 514-0280
E-mail: Vanessa.reed@usdoi .gov
Counsel for Plaintiff,